EXHIBIT A

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IRIDA KIMCA, DERRICK SAMPSON, BRITTANY TOMKO, JANCY ORTIZ, DINATRA WYNN, SARAH WARDALE, and JUANITA CORNETT, *individually and on behalf of all others similarly situated*, | Civil Action No. 21-12977 (SRC) |
| Plaintiffs, | OPINION |
| v. |  |
| SPROUT FOODS, INC. d/b/a SPROUT ORGANIC FOODS and SPROUT NUTRITION, |  |
| Defendant. |  |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court upon Defendant Sprout Foods, Inc.'s ("Defendant" or "Sprout") motion to dismiss the putative class action complaint filed by Plaintiffs Irida Kimca, Derrick Sampson, Brittany Tomko, Jancy Ortiz, Dinatra Wynn, Sarah Wardale, and Juanita Cornett (collectively "Plaintiffs"). Plaintiffs oppose Defendant's motion. The Court, having considered the papers filed by the parties, proceeds to rule on the motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will grant Defendant's motion and dismiss Plaintiffs' First Amended Complaint without prejudice.

**I.    BACKGROUND**

This case arises out of Defendant's marketing and advertising of its baby food products. The First Amended Complaint ("FAC") alleges Sprout's baby food products contained dangerous

1

levels of heavy metals.  (FAC ¶¶ 6, 7, 81).  Nevertheless, Plaintiffs allege Sprout "negligently, recklessly, and/or knowingly" failed to disclose to consumers the presence of these heavy metals, (FAC ¶ 81), and, even further, marketed its products as clean, healthy, and organic, (FAC ¶¶ 87, 88).  As such, Plaintiffs, and others, purchased Sprout's products in reliance on these false and misleading representations.  (FAC ¶¶ 20, 21, 22, 23, 24, 25, 26, 37).

Plaintiffs identify ten Sprout products that allegedly contained unsafe levels of heavy metals: Prunes Organic Baby Food, Carrot Apple Mango Organic Baby Food, Mixed Berry Oatmeal Organic Baby Food, Garden Vegetables Brown Rice with Turkey Organic Baby Food, Organic Veggie Power – Sweet Potato with Mango, Apricot & Carrot, Organic Puffs Baby Cereal Snack, Organic Crispy Chews Red Fruit Beet & Berry with Crispy Brown Rice Toddler Fruit Snack, Organic Wafflez, Organic Curlz, and Organic Crinklez.  (FAC ¶ 6).  The Court will refer to these products as the "Baby Food Products."  According to the FAC, each of the Baby Food Products have been "tested and confirmed to contain" greater than 10 parts per billions (ppb) of arsenic, greater than 5 ppb of cadmium, greater than 5 ppb of lead, "and/or" greater than 5 ppb of mercury.  (FAC ¶ 6 n.1).  This testing was done by Plaintiffs' counsel, the non-profit organization Healthy Babies Bright Futures ("HBBF"), and Consumer Reports.  (FAC ¶¶ 54–60).

Plaintiffs allege the amount of arsenic, lead, cadmium, and mercury in the Baby Food Products was harmful to their children.  In support of this assertion, Plaintiffs rely on certain standards set forth by the Food and Drug Administration ("FDA"), the Environmental Protection Agency ("EPA"), and other organizations.  With respect to arsenic, the FAC explains that the FDA and EPA have set a 10 ppb limit on arsenic in bottled and drinking water, respectively.  (FAC ¶ 70).  As to lead, the FAC identifies several possible standards concerning the potential danger arising from the metal's presence: one report from a non-profit concludes that "no safe level of

2

exposure has been identified," several different organizations recommend that lead in baby foods not exceed 1 ppb, and the European Union has set the limit at 20 ppb for infant formula. (FAC ¶¶ 71, 73). With respect to mercury, the FAC notes that the EPA has set a maximum of 2 ppb in drinking water. (FAC ¶ 77). Finally, regarding cadmium, the FAC states that the EPA and FDA have set a limit of 5 ppb in bottled and drinking water, and the World Health Organization ("WHO") has set a limit of 3 ppb in drinking water. (FAC ¶ 80).

To further bolster their allegations, plaintiffs also describe the deleterious health effects of heavy metals. They explain that lead, arsenic, cadmium, and mercury are all "neurotoxins," which alter the nervous system. (FAC ¶ 62). The FAC alleges that exposure to these heavy metals can cause cancer, the permanent loss of intellectual capacity, and behavioral disorders. (FAC ¶ 63). Because of these harmful effects, the FDA and WHO have recognized that arsenic, cadmium, lead, and mercury are dangerous to human health. (FAC ¶ 64). The FAC also describes the process of "bioaccumulation," through which heavy metals accumulate in the body over time, making the consumption of these metals even in small doses harmful, especially for vulnerable infants and babies. (FAC ¶¶ 66–68).

Finally, Plaintiffs allege that, despite the presence of these heavy metals in the Baby Food Products, Sprout marketed its food as safe and the "healthiest . . . on the market." (FAC ¶ 29). They cite Sprout's marketing materials, which labeled Sprout's food as "organic," "nutrient-dense," "wholesome," and "clean," among other descriptors. (FAC ¶¶ 32–35). Moreover, the FAC references the displays Sprout sent to retailers, which Plaintiffs allege "were designed to make consumers believe that Sprout [b]aby [f]ood was healthy and pure," and, thus did not contain heavy metals. (FAC ¶¶ 36, 37) (internal quotation omitted). As a result of these purportedly

misleading claims, Plaintiffs allege they and other consumers purchased Sprout's food for their children. (FAC ¶ 37).

The FAC contains eleven causes of action based on the above facts.[1] (FAC ¶¶ 108–90). It includes claims for breach of express and implied warranties, (FAC ¶¶ 108–28), negligent misrepresentation, (FAC ¶¶ 129–35), fraud, (FAC ¶¶ 136–40), unjust enrichment, (FAC ¶¶ 141–47), and violation of the consumer protection laws of various states, (FAC ¶¶ 148–90). Defendant has brought a motion to dismiss the FAC on a number of grounds. (ECF No. 45). Among other reasons, Defendant argues that the FAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs do not have standing to pursue the monetary and injunctive relief they seek. (Def. Br. at 13–20, 38–39). As explained more fully below, the Court agrees with Defendant. Thus, the FAC will be dismissed without prejudice.[2]

## II.  DISCUSSION

### A.  Legal Standards

#### 1. Standard of Review

Pursuant to Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

---

[1] Plaintiffs seek to certify eight separate classes pursuant to Federal Rule of Civil Procedure 23: one class including all consumers who purchased the Baby Food Products in the United States (the "Nationwide Class"), six separate classes comprising consumers from Connecticut, Illinois, New Jersey, Texas, New York, and Georgia, respectively (the "State Classes"), and a class seeking injunctive relief pursuant to Rule 23(b)(2) (the "Injunctive Relief Class"). (FAC ¶¶ 97–113).

[2] Because the Court dismisses the FAC on the threshold issue of standing, it need not address Sprout's other proposed grounds for dismissal here.

The Third Circuit has held that a motion to dismiss for lack of standing is a facial attack, rather than a factual attack, because it contests the sufficiency of the pleadings. In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012); S.S. v. Hillsborough Twp. Bd. of Educ., No. 20-cv-13077, 2022 WL 807371, at *4 (D.N.J. Mar. 17, 2022) ("The Court of Appeals for the Third Circuit has held that motions to dismiss for lack of standing are best understood as facial attacks."). In reviewing a facial attack, a court applies the same standard it would apply under Rule 12(b)(6). Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014); In re Schering Plough Corp., 678 F.3d at 243. As such, the Court will apply the familiar Rule 12(b)(6) standard to Sprout's standing arguments.

Under this standard, "[w]ith respect to 12(b)(1) motions in particular, '[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'" In re Schering Plough Corp., 678 F.3d at 244 (alteration in original) (quoting Stalley v. Cath. Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007)). A complaint will meet this plausibility standard when it includes more than mere "labels and conclusions." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

2. Article III Standing and the Injury Requirement

Article III of the Constitution limits the federal judicial power to "cases" and "controversies." U.S. Const., art. III, § 2. Standing—one of several justiciability doctrines that enforces Article III's case-or-controversy requirement—requires the plaintiff to allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." Warth v.

5

Seldin, 422 U.S. 490, 498–99 (1975) (internal quotation omitted) (citing Baker v. Carr, 369 U.S. 186, 204 (1962)).  The plaintiff bears the burden of adequately alleging three elements to establish standing: (1) injury in fact, (2) a "causal connection between the injury and the conduct complained of," and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41–42) (1976)).  In the class action context, at least one named plaintiff must satisfy all of these requirements.  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

Here, Sprout contends that Plaintiffs do not have standing because they have not demonstrated that they suffered an injury in fact. (Def. Br. at 13–20).  To satisfy the injury requirement, the alleged injury must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (internal quotation omitted).  "[T]he injury in fact test requires more than injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  Id. at 563 (quoting Sierra Club v. Morton, 405 U.S. 727, 734–35 (1972)).

## B.  Plaintiffs Lack Standing to Pursue Monetary Relief

Sprout argues the FAC fails to establish that Plaintiffs suffered an injury in fact sufficient to establish standing to seek monetary damages for three reasons.[3]  First, Sprout contends that the FAC does not adequately allege that any of the products purchased by Plaintiffs contained heavy metals.  (Def. Br. at 14–17).  Second, Sprout maintains that, even if the products purchased by

---

[3] Sprout also argues all of Plaintiffs' claims fail on the merits for these same three reasons because all of their claims also require injury as an element.  (Def. Br. at 13).  Indeed, the parties both discuss injury for standing purposes and injury as an element of Plaintiffs' claims interchangeably.  (Def. Br. at 13–20); (Pl. Br. at 8–14).  Nevertheless, because the standing inquiry is separate from "any assessment of the merits of the plaintiff's claim," the Court will limit its discussion here to standing without addressing any merits arguments.  Cottrell v. Alcon Lab'ys, 874 F.3d 154, 162 (3d Cir. 2017).

6

Plaintiffs contained heavy metals, the FAC does not adequately allege that the amount of heavy metals in Sprout's products were unsafe or dangerous. (Def. Br. at 17–18). Finally, Sprout argues that the FAC does not adequately allege economic injury. (Def. Br. at 18–20). The Court finds Sprout's first argument meritless but agrees with its second and third arguments.

1. Plaintiffs sufficiently allege that the Baby Food Products they purchased contained heavy metals.

First, Sprout highlights the FAC's failure to allege that Plaintiffs personally purchased any Baby Food Products that contained heavy metals. (Def. Br. at 14). Instead, Plaintiffs rely on testing done by their counsel and other third parties which purportedly demonstrates that the Baby Food Products contained high levels of heavy metals. (Def. Br. at 14–15). Sprout maintains that Plaintiffs' failure to test the baby food they personally bought dooms their claims—according to Defendant, Plaintiffs cannot rely on testing done on baby food they did not buy or consume to establish injury. (Def. Br. at 15–17).

Sprout relies on Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1030 (8th Cir. 2014), to support its position. There, the plaintiffs alleged the defendant mislabeled its hot dogs as "100% kosher" when, in fact, some of the defendant's beef products were not kosher. Id. at 1028. The Eighth Circuit held that the plaintiffs did not have standing to bring the claim because they had only alleged that "some" of the hot dogs were mislabeled. Id. at 1030–31. Therefore, "it [was] pure speculation to say the particular packages sold to the consumers were tainted by non-kosher beef." Id. at 1031. As relevant here, the court concluded "it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." Id. at 1030 (quoting In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 606, 616 (8th Cir. 2011)); see also Pels v. Keurig Dr. Pepper, Inc., No. 19-cv-03052, 2019 WL 5813422, at *4–*5 (N.D. Cal. Nov. 7,

7

2019) (granting a motion to dismiss for lack of standing where the plaintiff did not allege that he purchased water sold by the defendant that contained "violative levels of arsenic" and noting that not all of the defendant's water came from the same source so it was possible that some contained arsenic and some did not).

However, other courts have not required plaintiffs to allege they purchased a defective product, instead allowing them to establish injury for standing purposes using representative testing at the motion to dismiss stage. E.g., John v. Whole Foods Market Grp., Inc., 858 F.3d 732, 736–37 (2d Cir. 2017) (finding that a government report indicating that 89 percent of Whole Foods' pre-packaged products were overweight resulting in overcharges to customers was sufficient to defeat a motion to dismiss based on lack of injury where the plaintiff also alleged he bought pre-packaged products at Whole Foods every month); In re Gen. Mills Glyphosate Litig., No. 16-cv-02869, 2017 WL 2983877, at *1–*3 (D. Minn. Jul. 12, 2017) (holding that the plaintiffs had adequately alleged injury partly because the complaint referenced independent laboratory testing indicating that the defendant's products contained the chemical glyphosate); Fishon v. Mars Petcare US, Inc., 501 F. Supp. 3d 555, 565 (M.D. Tenn. 2020) (explaining that the plaintiffs had established standing based on independent testing finding that dog food the defendant advertised as grain-free, in fact, contained grain). Plaintiffs argue the testing results referenced in the FAC are sufficient to establish standing under these cases. (Pl. Br. at 8–9).

The Court agrees with Plaintiffs. The case here is analogous to In re General Mills Glyphosate Litigation, No. 16-cv-02869, 2017 WL 2983877 (D. Minn. Jul. 12, 2017). There, the plaintiffs brought suit alleging that General Mills' Nature Valley products were falsely advertised as containing only whole grain oats when, in fact, the products contained trace amounts of glyphosate—an herbicide and desiccant. Id. at *1. The plaintiffs' complaint identified twenty-

8

three flavors of Nature Valley Products that contained glyphosate and provided independent laboratory testing to substantiate this claim. Id. at *1. In finding that the plaintiffs had established injury for standing purposes, the court explained that Wallace was inapplicable because the plaintiffs alleged that all of products at issue—that is, every food item sold in each of the twenty-three flavors—contained glyphosate. Id. at *2–*3. By contrast, the Wallace plaintiffs had conceded that at least some of the hot dogs at issue were kosher and, therefore, did not contain the alleged defect.[4] Id. at *3. Thus, under In re General Mills, and other cases like it, plaintiffs can establish standing using representative testing where they allege that all of the products sold by the defendant contain the alleged defect. See Fishon, 501 F. Supp. 3d at 565 ("[U]nlike in Wallace there is nothing in the [c]omplaint to suggest that only some [of the products] contained . . . unwanted ingredients."); Van Slomski v. Hain Celestial Grp., Inc., No. 13-cv-01757, 2014 WL 12771116, at *5 (C.D. Cal. June 10, 2014) (distinguishing Wallace based on the fact that the plaintiffs "broadly allege[d] that the teas contain[ed] pesticides, rather than merely alleging that some of the packages contain[ed] pesticides").

Here, Plaintiffs have sufficiently alleged that all of the Baby Food Products contain heavy metals by "focus[ing] their allegations on particular product[s]." Rice-Sherman v. Big Heart Pet Brands, Inc., No. 19-cv-03613, 2020 WL 1245130, at *7 (N.D. Cal. Mar. 16, 2020). Indeed, Plaintiffs identify ten product lines produced by Sprout, and bought by Plaintiffs, that allegedly contain "elevated and unsafe levels of heavy metals." (FAC ¶ 6). These allegations are supported by testing of individual packages across the ten product lines conducted by three separate entities.

---

[4] Other cases have outright rejected Wallace's reasoning rather than simply distinguishing Wallace on the facts. E.g., McCoy v. Nestle USA, Inc., 173 F. Supp. 3d 954, 964 (N.D. Cal. 2016) (explaining that Wallace creates a "bizarre result" wherein "sellers advertising food as halal or kosher, diamonds as conflict-free, or products as union-made could knowingly mix compliant and non-compliant products with impunity so long as there was no way for a buyer to trace the specific item he or she purchased back to the source").

9

(FAC ¶¶ 56, 57, 60). And there is nothing in the FAC that indicates some subset of packages within each of these product lines might not contain heavy metals.[5] Rice-Sherman, No. 19-cv-03613, 2020 WL 1245130, at *7 (finding that the plaintiffs adequately alleged injury where they did not identify any inconsistencies as to the products that were purportedly falsely advertised). These allegations are sufficient to establish a plausible inference that every package of the Baby Food Products, including those purchased by Plaintiffs, contains the heavy metals.[6]

This conclusion is bolstered by the fact that this case is at the motion to dismiss stage. Courts that have allowed plaintiffs to use representative testing to establish injury have emphasized the leniency of the Rule 12(b)(6) standard. E.g., John, 858 F.3d at 737 (recognizing that the plaintiff "may ultimately be unable to show he was injured under the more demanding standards applicable at summary judgment or trial" but finding that "a facial attack on the pleadings" was not the proper venue for determining the merits of the plaintiff's testing methodologies and findings). One court explained "[p]laintiffs do not need to prove their case at the pleading stage," and noted that "courts have permitted consumer claims in nationwide class actions regarding product mislabeling to move forward based on limited testing, including a single test on a single sample of the product at issue." Fishon, 501 F. Supp. 3d at 566 (quoting In re Herbal Supplements Mktg. & Sales Practice Litig., No. 15-cv-05070, 2017 WL 2215025, at *12 (N.D. Ill. May 19,

---

[5] While summarizing the testing done by Plaintiffs' counsel, the FAC states "[o]ther Sprout baby foods that were tested did not contain elevated and unsafe levels of heavy metals." (FAC ¶ 58). This statement is fairly interpreted as referring to products outside of the ten identified in the FAC.

[6] It appears, however, that Plaintiffs do not allege that they purchased two of the product lines for which the FAC contains testing results: Prunes Organic Baby Food and Garden Vegetable Brown Rice with Turkey Organic Baby Food. Neither the FAC nor Plaintiffs' briefing indicates any of them purchased Garden Vegetable Brown Rice with Turkey Organic Baby Food. Plaintiffs do argue in their brief that Plaintiff Tomko purchased Prunes Organic Baby Food. (Pl. Br. at 11). But this argument is contradicted by the FAC which states that Plaintiff Tomko purchased "various Sprout Baby Foods, including but not limited to Carrot Apple Mango Organic Baby Food, Mixed Berry and Oatmeal Organic Baby Food, and Organic Puffs . . . ." (FAC ¶ 22). Without any allegation that Plaintiffs purchased these products, they do not have standing to bring any claims based on either product line. Lieberson v. Johnson & Johnson Consumer Cos., 865 F. Supp. 2d 529, 537 (D.N.J. 2011) (finding that the plaintiff did not have standing to bring consumer protection claims based on products she did not purchase or use).

2017)). As such, Plaintiffs' use of representative testing to establish injury here is adequate and, contrary to Sprout's argument, they need not allege that they personally purchased any products containing heavy metals.

> 2. <u>Plaintiffs fail to allege that the Baby Food Products contained heavy metals in amounts sufficient to establish injury.</u>

Sprout's second argument fares better, however. Plaintiffs' theory of injury is that their children are now at an increased risk of adverse health consequences as a result of their consumption of the Baby Food Products containing heavy metals. While an increased risk of future harm may be sufficient to establish injury for standing purposes, <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 341 (2016), the future harm must be "certainly impending," <u>Lujan</u>, 504 U.S. at 564 n.2 (internal quotation omitted). "In increased risk of injury cases involving products liability, courts generally require a plaintiff to allege '(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account.'" <u>Backus v. General Mills, Inc.</u>, 122 F. Supp. 3d 909, 922 (N.D. Cal. 2015) (quoting <u>Herrington v. Johnson & Johnson Consumer Cos.</u>, No. 09-cv-01597, 2010 WL 3448531, at *3 (N.D. Cal. Sep. 1, 2010)).

Sprout maintains that Plaintiffs do not meet this standard. According to Sprout, even if Plaintiffs sufficiently alleged that they purchased products with elevated levels of heavy metals, the FAC does not support the conclusion that the consumption of these products caused a substantially increased risk of future harm to their children. (Def. Br. at 17–18). Plaintiffs respond that their allegations are sufficient to raise a plausible inference that the Baby Food Products put their children at a substantial risk of harm. They maintain that the testing referenced in the FAC indicates that each of the ten Baby Food Products "exceed accepted standards" for exposure to the heavy metals. (Pl. Br. at 10–11). For Plaintiffs, it follows that the quantities of heavy metals in

11

the Baby Food Products pose an increased risk of injury sufficient to give rise to standing.[7] (Pl. Br. at 10–11).

Plaintiffs' argument fails. Most importantly, it is not clear that the "accepted standards" identified in the FAC are applicable to baby food. The FAC borrows standards promulgated in different contexts. For example, it references the FDA's 10 ppb limit on arsenic in bottled water, (FAC ¶ 70), the EPA's 10 ppb limit on arsenic in drinking water, (FAC ¶ 70), the EPA's 2 ppb limit on mercury in drinking water, (FAC ¶ 77), the EPA's 5 ppb limit on cadmium in drinking water, (FAC ¶ 80), the FDA's 5 ppb limit on cadmium in bottled water, (FAC ¶ 80), and the WHO's 3 ppb limit on cadmium in drinking water, (FAC ¶ 80).[8] However, the FAC does not contain any background information or explanation indicating that these are apt comparisons for use in the context of baby food. See Doss v. General Mills, Inc., No. 18-cv-61924, 2019 WL 7946028, at *3 (S.D. Fla. June 14, 2019), aff'd 816 F. App'x 312 (11th Cir. 2020) (explaining that the plaintiff's reference to a "health benchmark" was inconsequential with regard to whether the amount of toxins in the defendant's food product was dangerous because the plaintiff did not explain how the benchmark level related to the other allegations in the complaint). In fact, the FAC leads to the inference that the opposite is true: it states that the FDA is considering setting the "action level" for arsenic in rice cereal for infants at 100 ppb, more than ten times the FDA's

---

[7] It appears that Plaintiffs do not provide any testing results for one of the Baby Food Products: Organic Crispy Chews Red Fruit Beet & Berry with Crispy Brown Rice Toddler Fruit Snack. Without any testing, there is no basis for the Court to conclude that the product contained unsafe levels of heavy metals.

[8] As to lead, the FAC maintains that there is no safe level of exposure. (FAC ¶ 71). However, it also notes that the European Union has limited lead in infant formula to 20 ppb. (FAC ¶ 73). Only one of the Baby Food Products contains more than 20 ppb of lead: Organic Puffs Baby Cereal Snack. (FAC ¶ 56). Nevertheless, the Court declines to conclude that this product plausibly poses a substantial risk of future harm because the European Union's regulations also pertain to a different product—infant formula rather than rice cereal.

12

limit on arsenic in bottled water.[9] (FAC ¶ 70). This suggests that the applicable limits for baby food are much higher than those used for bottled and drinking water.

Moreover, courts have declined to use similar cross-product comparisons to establish injury at the motion to dismiss stage. For example, in Boysen v. Walgreen Co., No. 11-cv-06262, 2012 WL 2953069 (N.D. Cal. Jul. 19, 2012), the court did not apply the FDA's bottled water standard to juice products. Id. at *5–*6. This decision was based partly on the fact that the level of toxins in the defendant's juice products were within the FDA's guidelines advisory ranges for those products. Id. at *5. However, the court also explained that the FDA set higher guidelines levels for juice than for water because juice consumption is lower than drinking water intake. Id. at *5 n.5. Similarly, here, water and baby food are two fundamentally different products which are ingested and processed by the human body differently and consumed in different amounts. As such, the Court cannot plausibly draw the inference from the FAC that the guidelines levels for water are applicable to baby food.

Furthermore, in Koronthaly v. L'Oreal USA, Inc., No. 07-cv-05588, 2008 WL 2938045 (D.N.J. Jul. 29, 2008), aff'd 374 F. App'x 257 (3d Cir. 2010), the court found that plaintiffs had not adequately alleged injury due to the presence of lead in the defendants' lipstick. Id. at *4–*5. There, the plaintiff alleged that the lipstick contained dangerous amounts of lead based on the FDA's regulation of lead levels in candy. Id. at *1. The court dismissed her argument, explaining that the FDA did not regulate the levels of lead in lipstick and, thus, the plaintiff's only complaint was that "the lipstick's levels of lead are unsatisfactory to her." Id. at *5. Here, like the Koronthaly

---

[9] The FDA document referenced in the FAC indicates that this action level would only pertain to inorganic arsenic. FDA, Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance for Industry 6 (2020), https://www.fda.gov/media/97234/download. According to Plaintiffs' testing, none of the Baby Food Products contain greater than 100 ppb of inorganic arsenic.

13

plaintiff's reference to the FDA's regulation of candy, the use of water benchmarks in the baby food context is arbitrary and unexplained. Without any clarification as to why these guidelines might be applicable, Plaintiffs are simply complaining that the quantities of heavy metals in the Baby Food Products were unacceptable to them.

Both Boysen and Koronthaly also relied on the fact that the FDA had indicated that the products at issue were safe. In Boysen, the court explained "the FDA has issued reports stating that the levels of lead and arsenic found in juice products such as defendant's are safe." No. 11-cv-06262, 2012 WL 2953069, at *6. And in Koronthaly the Third Circuit upheld the district court's decision by referencing an FDA report "finding that the lead levels in the [d]efendant's lipsticks were not dangerous." 374 F. App'x 257, 258 (3d Cir. 2010). Other courts have declined to find injury for standing purposes based partly on similar statements by the FDA. See, e.g., Herrington, No. 09-cv-01597, 2010 WL 3448531, at *3 n.2 (noting that the FDA concluded that the level of probable carcinogens in the products at issue "d[id] not present a hazard to consumers"). Here, in the wake of Congressional reports regarding heavy metals in baby food, the FDA stated, "at the levels we have found through our testing . . . children are not at an immediate health risk from exposure to toxic elements in foods." FDA Letter to Industry on Chemical Hazards, Including Toxic Elements, in Food and Update on FDA Efforts to Increase the Safety of Foods for Babies and Young Children (Mar. 5, 2021), https://www.fda.gov/food/cfsan-constituent-updates/fda-letter-industry-chemical-hazards-including-toxic-elements-food-and-update-fda-efforts-increase (cited as Exhibit 3 to Def. Br.).[10] At the very least, this statement

---

[10] Plaintiffs do not appear to dispute the Court's power to consider this statement even though it is not contained in the FAC. Indeed, the Court may properly take judicial notice of the material on the FDA's website. On a motion to dismiss, a court may consider matters of public record in addition to the allegations in the complaint and exhibits attached to the complaint. Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 988 F.2d 1192, 1196 (3d Cir. 1993); see also Korotki v. Levenson, No. 20-cv-11050, 2021 WL 2650775, at *3 (D.N.J. June 28, 2021) ("Even. . . where the [c]ourt is limited to the allegations plead on the face of the complaint, a court may consider judicially noticeable facts without converting a motion to dismiss into a motion for summary judgment"). "It is not uncommon

14

weakens the inference that the amount of heavy metals in the Baby Food Products creates a substantial risk of danger to children.

In all then, the case here is akin to Herrington v. Johnson & Johnson Consumer Companies, Inc., No. 09-cv-01597, 2010 WL 3448531 (N.D. Cal. Sep. 1, 2010). There, the plaintiffs alleged that children's bath products manufactured by the defendants were mislabeled as safe when they actually contained possible carcinogens and other unsafe contaminants. Id. at *1. In finding that the plaintiffs did not have standing to bring their claims, the court explained that the plaintiffs "d[id] not plead facts to suggest that a palpable risk exists" because "[t]hey only allege[d] that [the contaminants] may be carcinogenic for humans, that there could be no safe levels for exposure to carcinogens and that [the bath] products contain some amount of these substances." Id. at *3.

Like the plaintiffs in Herrington, Plaintiffs fail to plausibly allege a key inference necessary for standing. They allege (1) that the Baby Food Products contain heavy metals and (2) that elevated levels of heavy metals can be unsafe and dangerous. However, they do not connect these two allegations by establishing that the levels of heavy metals in the Baby Food Products are unsafe. See Boysen, No. 11-cv-06262, 2012 WL 2953069, at *7 ("Plaintiff has plead that arsenic and lead are harmful toxins, and that the products contain those toxins, but he does not expressly allege that the levels of lead and arsenic contained in defendant's juices are likely to cause physical harm."). Without this connection, Plaintiffs' allegations are simply speculation. Doss, No. 18-cv-

---

for courts to take judicial notice of factual information found on the world wide web." O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007). This is especially true where the information is found on a government agency website. Paralyzed Veterans of Am. v. McPherson, No. 06-cv-04670, 2008 WL 4183981, at *5 (N.D. Cal. Sep. 9, 2008) (collecting cases). And, finally, the Court finds it appropriate to take judicial notice of the FDA's statements regarding the toxicity of baby food here. In their pleadings, Plaintiffs cherry-pick the information they provide to the Court by citing FDA action levels and statements pertaining to other products and materials besides baby food. Consideration of the FDA's statements concerning baby food provides the Court with a more complete picture by which to evaluate Plaintiffs' claims.

15

61924, 2019 WL 7946028, at *3 ("Mere conjecture that something has the potential to be harmful is not enough."). That is insufficient to establish injury.

      3. <u>Plaintiffs fail to sufficiently allege that they have suffered an economic injury.</u>

Plaintiffs have also failed to establish economic injury for similar reasons. The Third Circuit has identified three avenues for pleading economic injury. <u>See generally</u> <u>In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practice & Liability Litigation</u>, 903 F.3d 278 (3d Cir. 2018). First, under the alternative product theory, "a plaintiff might successfully plead economic injury by alleging that, absent the defendant's conduct, she would have purchased an alternative product that was less expensive." <u>Id.</u> Second, under the premium price theory, "a plaintiff may plead economic injury by alleging that the defendant unlawfully advertised its product as being 'superior' to others." <u>Id.</u> at 283. Third, under the benefit of the bargain theory, "a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value." <u>Id.</u>

Here, Plaintiffs allege their "economic injury was caused by paying for Sprout Baby Foods they would not have purchased, or would have paid less for, if Defendant had disclosed material information about the presence of heavy metals. . . or bio-accumulation . . . ." (Pl. Br. at 12). This could be interpreted as either a price premium argument or a benefit of the bargain argument. However, neither theory can support Plaintiffs' economic injury claim.

First, as to the price premium theory, Plaintiffs have not adequately alleged that Sprout's alleged misrepresentations and omissions caused them to pay an unfair premium price. <u>In re Johnson & Johnson</u>, 903 F.3d at 282 (explaining that the injury suffered by the plaintiff under the price premium theory is the "unfair 'premium' that the plaintiff was induced to pay"). Instead, they include only "threadbare" allegations that they would not have paid as much for the Baby Food Products if they had known that they contained heavy metals. <u>Hubert v. Gen. Nutritional</u>

16

Corp., No. 15-cv-01391, 2017 WL 3971912, at *8 (W.D. Pa. Sep. 8, 2017) (rejecting the plaintiffs' economic injury clam based on a price premium theory because the plaintiffs only offered the "threadbare" allegation that the defendant's misrepresentations caused them to pay more without any other factual support). Plaintiffs do not identify any other comparable, cheaper, or safer products to show that they, in fact, paid a premium for the Baby Food Products. Id. (finding it significant that the plaintiffs did not identify any cheaper products); see also Estrada v. Johnson & Johnson, No. 16-cv-07492, 2017 WL 2999026, at *15 (D.N.J. Jul. 14, 2017), aff'd 908 F.3d 278 (3d Cir. 2018) (same). This lack of supporting allegations dooms their price premium claims.[11]

Second, Plaintiffs cannot proceed under a benefit of the bargain theory either. In that respect, this case is analogous to the facts of In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practice & Liability Litigation, 903 F.3d 278 (3d Cir. 2018). There, the plaintiff brought suit on behalf of herself and other similarly situated consumers alleging she suffered an economic injury when she purchased improperly marketed baby powder, produced by Johnson & Johnson, that had been found to cause an increased risk of ovarian cancer. Id. at 282. She argued she had suffered an injury under the benefit of the bargain theory when she bargained for baby powder that would be safe but had instead got baby powder that was unsafe. Id. at 283.

The Third Circuit held that the plaintiff did not establish injury for standing purposes. The court explained that the plaintiff had not adequately plead that she purchased baby powder that was worth less than what she paid for it. In re Johnson & Johnson, 908 F.3d at 287. That was because the plaintiff "did not allege that she developed ovarian cancer, nor did she allege she is at risk of developing ovarian cancer in the future as a result of her [b]aby [p]owder use." Id. at 289.

---

[11] The failure to plead that a cheaper comparable product existed also means Plaintiffs cannot establish economic injury under an alternative products theory. See In re Johnson & Johnson, 903 F.3d at 282–83 (explaining that, under the alternative products theory, the injury to the plaintiff is "calculated by determining the difference in price between the defendant's more expensive product and the less expensive alternative).

17

Thus, the court concluded that the plaintiff had merely alleged the product was safe as to her but unsafe as to others. Id. If, on the other hand, she had alleged she was at risk of developing ovarian cancer, "she may have established standing on a theory of future physical injury." Id.

Similarly, here, as discussed in Section II.B.2 above, Plaintiffs have not adequately alleged that their children are at risk of harm from the Baby Food Products. So, like the plaintiff in In re Johnson & Johnson, Plaintiffs cannot establish economic injury under the benefit of the bargain theory. In re Johnson & Johnson, 903 F.3d at 289–90; see also In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig., 831 F. Supp. 2d 507, 512 (D. Mass. 2011) ("Because Plaintiffs are unable to show that any actual harm resulted from consumption of the fruit juice products, their allegation of 'economic' injury lacks substance." (emphasis in original)).

Plaintiffs argue that their allegations are distinguishable from In re Johnson & Johnson because, unlike the plaintiff there, they allege that the Baby Food Products were worthless. (Pl. Br. at 12–13; FAC ¶ 113)). But Plaintiffs' assert the products were worthless precisely because they allegedly exposed their children to the risk of future harm—they do not otherwise allege that the Baby Food Products did not perform their intended purpose or that the products were worthless for any other reason. See James v. Johnson & Johnson Consumer Cos., No. 10-cv-03049, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (explaining that a plaintiff cannot establish economic injury "so long as there were no adverse health consequences, and the product worked as intended . . . ."). Therefore, without any plausible allegations of future risk, the allegation that the Baby Food Products were worthless also falls apart. See In re Fruit Juice Prods., 831 F. Supp. 2d at 512 (rejecting the argument that fruit juice products were "valueless" because "the fact is that [the plaintiffs] paid for fruit juice, and they received fruit juice, which they consumed without suffering harm"). As such, Plaintiffs' economic injury claim fails.

18

### C. Plaintiffs Lack Standing to Pursue Injunctive Relief

Finally, Plaintiffs do not have standing to obtain injunctive relief either. Plaintiffs seek injunctive relief requiring Defendant to engage in "corrective advertising," and enjoining Defendant from continuing the unlawful practices alleged in the FAC, among other requests. (FAC p. 49). In order to have standing to obtain injunctive relief, Plaintiffs must show that they are "likely to suffer future injury" from Defendant's ongoing conduct. McNair v. Synapse Grp., Inc., 672 F.3d 213, 223 (3d Cir. 2012) (quoting City of L.A. v. Lyons, 461 U.S. 95, 105 (1983)).

Plaintiffs are not likely to suffer future injury from Sprout's conduct. At bottom, Plaintiffs are alleging that Sprout engaged in deceptive and false advertising which induced them to buy the Baby Food Products. Because Plaintiffs have brought this lawsuit, it is common sense that they are now aware of the alleged risks associated with the Baby Food Products and, thus, will not be deceived by Sprout's marketing in the future. See McNair, 672 F.3d at 225 ("[S]peaking generally, the law accords people the dignity of assuming that they act rationally, in light of the information they possess."); Pierre v. Healthy Beverage, LLC, No. 20-cv-04934, 2022 WL 596097, at *6 (E.D. Pa. Feb. 28, 2022) ("For now, however, the [c]ourt must assume [p]laintiffs will act rationally by not purchasing a tea they allege is misleadingly labeled as a low-sugar beverage."). As such, any risk of being misled by Defendant again is merely speculative.

This conclusion is consistent with Third Circuit precedent. For example, in McNair v. Synapse Group, Inc., 672 F.3d 213 (3d Cir. 2012), former customers of a magazine marketing company alleged that the company sold subscriptions in a misleading way. Id. at 219. The Third Circuit held that the former customers did not have standing to pursue injunctive relief because they were already aware of the company's allegedly deceptive practices. Id. at 224–26. Similarly, here, Plaintiffs are aware of Sprout's allegedly misleading advertising of the Baby Food Products.

Plaintiffs attempt to distinguish the case here from McNair by arguing that, unlike the plaintiffs in McNair, they have alleged they would buy Sprout's products again if they did not contain heavy metals. (Pl. Br. at 13–14). However, the Third Circuit rejected this very argument in In re Johnson & Johnson. There, the plaintiff also argued McNair should be limited to cases in which the plaintiffs do not allege that they intend to purchase the allegedly defective products in the future. In re Johnson & Johnson, 903 F.3d at 293. The court explained that the plaintiffs' failure to allege an intention to buy again did not play a "key role" in the McNair court's analysis. Id. Rather, the "holding in McNair was instead more focused on the crucial fact that the former customers were already aware of the allegedly deceptive business practices from which they sought future protection." Id. As such, Plaintiffs' intention to purchase the Baby Food Products again does not distinguish this case from McNair.

Lastly, Plaintiffs argue that, because McNair is a Third Circuit case, it only prevents the named Plaintiffs who reside in states in the Third Circuit from establishing standing. (Pl. Br. at 14). This is not true. This Court is bound by the Third Circuit's standing jurisprudence no matter where the litigants reside. See Vujosevic v. Rafferty, 844 F.2d 1023, 1030 n.4 (3d Cir. 1988) ("It is, of course, patent that a district court does not have the discretion to disregard controlling precedent . . . ."). Thus, McNair, and its progeny, preclude all of the named Plaintiffs from establishing standing to pursue injunctive relief here.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss will be granted. An appropriate Order will be filed together with this Opinion.

                                                      s/Stanley R. Chesler  
                                                      STANLEY R. CHESLER  
                                                      United States District Judge

Dated: April 25, 2022